## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TERESITA LUEVANO,

     Plaintiff,

v.                                       CIV 05-0803 WPL

JO ANNE B. BARNHART,
Commissioner of Social Security,

     Defendant.

## MEMORANDUM OPINION AND ORDER

     Teresita Luevano applied for Social Security disability insurance benefits on October 18, 2002, claiming that she became disabled because of a broken knee. (Administrative Record (AR) 14-15.) Following an adverse decision by the Commissioner of Social Security (Commissioner), she brought an action for review in this Court. (Doc. 1.) Luevano argues that the decision of the Administrative Law Judge (ALJ) is not supported by substantial evidence in the record. (Doc. 8 at 2.) Specifically, she argues that the ALJ: (1) erred in his evaluation of pain, (2) erred in finding that she was not credible, (3) erred in his evaluation of her Residual Functional Capacity (RFC), (4) failed to adequately develop the record, and (5) erred by improperly questioning the vocational expert (VE). *Id.* at 2-5. This matter is before me now on Luevano's motion to reverse or remand (Doc. 7) and her brief in support (Doc. 8), the Commissioner's response (Doc. 9), and Luevano's reply (Doc. 10). Having considered the briefs, pleadings, and applicable law, I will deny Luevano's motion.

### PROCEDURAL BACKGROUND

     Luevano filed for benefits on October 18, 2002. (AR 14, 45.) She alleged that she had become unable to work because of a broken knee she suffered on August 20, 2002. *Id.* at 58. ALJ

Gerald Cole conducted a hearing on November 20, 2003. *Id.* at 281-82. ALJ Cole denied Luevano's application on January 21, 2005. *Id.* at 22. The Appeals Council denied review on May 27, 2005. *Id.* at 5.

The ALJ found that the evidence belied Luevano's claim of disabling pain. *See id.* at 18-19. He noted that she engaged in various daily activities, such as washing dishes, driving, cleaning the house, and shopping. *Id.* at 18. He also noted that her fracture was completely healed and that she could walk without crutches or a cane. *Id.* The consultative examiner, Dr. Nancy Alexander, had found that Luevano could do one to two hours of walking or standing in an eight-hour workday and that she should be able to be retrained and enter the workforce. *Id.* The ALJ also took note of the fact that Luevano took no prescription pain medication and was not currently seeing any doctors despite the availability of household income. *Id.* He stated that her pain was not so great as to interfere with her knitting and ceramics painting. *Id.* at 18-19. He found that her allegations of pain and limitation were out of proportion to the objective evidence and her testimony. *Id.* at 19. He further stated that her credibility was diminished by her apparent change in behavior when she was aware that she was being observed. *Id.*

The ALJ determined that Luevano retained the RFC to lift and carry ten pounds occasionally and less than ten pounds frequently. *Id.* He found that she could stand for one hour per day and sit for eight hours in an eight-hour workday, but could never kneel or stoop. *Id.* Accordingly, he found that Luevano was unable to return to any of her past relevant work. *Id.*

The ALJ determined that Luevano was "capable of performing a significant range of sedentary work as defined in 20 C.F.R. § 404.1567." *Id.* at 20. The ALJ noted that the VE had determined that a hypothetical worker with Luevano's relevant characteristics could work as a sewing machine

operator, an eyeglass assembler, or a Christmas ornament maker.[1]  *Id.*  Because he found that

Luevano was capable of working in jobs that exist in significant numbers in the national economy,

the ALJ made a finding of "not disabled."  *Id.*  Based on that finding, he ruled that Luevano was not

entitled to disability insurance benefits.  *Id.* at 20-21.

On May 27, 2005, the Appeals Counsel denied Luevano's request for review of the ALJ's

decision.  *Id.* at 5.  Luevano then filed a civil action in this court seeking review of that decision.

(Doc. 1.)

FACTUAL BACKGROUND

Luevano was born in 1961.  (AR 45.)  She has performed several types of work, including

washing dishes, cleaning houses, and agricultural work.  *Id.* at 71-74, 295.  Her most recent

employment was chopping cotton.  *Id.* at 59, 74, 289.  She broke her knee at work on August 20,

2002, when she slipped and hit her knee on a ditch.  *Id.* at 58, 135.  She stopped working the same

day.  *Id.* at 58.  She stated that her ability to work was limited because she could not put pressure on

her leg.  *Id.*

Diagnostic imaging performed on August 20, 2002 revealed a nondisplaced fracture of the

left patella.[2]  *Id.* at 124.  Dr. Earl Latimer examined her on August 28, 2002, finding that it was

difficult to examine her because of pain.  *Id.* at 135.  He prescribed the use of a knee immobilizer for

five weeks.  *Id.*  Dr. Latimer examined Luevano again on September 16, 2002.  *Id.* at 132.  He noted

---

[1] The VE's responses to the interrogatories reveal information regarding the occupations of sewing machine operator and eyeglass assembler.  (*See* AR 113.)  It appears that she intended to include information regarding at least one more occupation on the other side of the page she was completing.  *See id.*  However, the other side of that page does not appear in the record and it is not referenced in any other response to the interrogatories.

[2] The patella is also known as the kneecap.  *See* STEDMAN'S MEDICAL DICTIONARY 1331 (27th ed. 2000).

that the fracture was healing with some soft tissue swelling. *Id.* Luevano and her husband apparently had some difficulty with the knee immobilizer. *See id.* at 133. They "quit using the knee immobilizer . . . because they thought it was too small because there was a hole around the kneecap." *Id.* The proper use of the knee immobilizer was explained to them. *Id.*

Dr. Latimer noted on October 9, 2002 that the patella fracture was completely healed; it healed "anatomically." *Id.* at 129. He also noted that Luevano was experiencing pain and weakness. *Id.* He prescribed physical therapy. *Id.* Dr. Latimer found at Luevano's November 6, 2002 visit that she had "findings consistent with an internal derangement in her knee." *Id.* He reiterated, though, that her patella fracture was healed. *Id.*

Luevano again saw Dr. Latimer on November 18, 2002. *Id.* at 127. He noted that she could have "a medial meniscal tear or an increased signal in the medial meniscus," and also noted that the radiologist thought it was a medial meniscal tear.[3] *Id.* Dr. Latimer stated that Luevano had "findings consistent with medial meniscal tear and also has a positive MRI." *Id.* He discussed arthroscopy with Luevano and stated that she wished to proceed with the surgery.[4] *Id.*

On December 10, 2002, Luevano underwent a left knee arthroscopy and a minimal chondroplasty of the medial femoral condyle.[5] *Id.* at 166. Dr. Latimer found some minimal

---

[3] The meniscus is a "crescent-shaped fibrocartilaginous structure of the knee." STEDMAN'S MEDICAL DICTIONARY at 1091.

[4] Arthroscopy is the "[e]ndoscopic examination of the interior of a joint." STEDMAN'S MEDICAL DICTIONARY at 151.

[5] Chondroplasty means "[r]eparative or plastic surgery of cartilage." STEDMAN'S MEDICAL DICTIONARY at 342. Femoral means "[r]elating to the femur or thigh. *Id.* at 655. A condyle is a "rounded articular surface at the extremity of a bone." *Id.* at 397.

chondromalacia of the medial femoral condyle.[6]  *Id.*  He noted that Luevano tolerated the procedure well.  *Id.*

At a visit to Dr. James Boss on December 19, 2002, Luevano had flexion in her knee to about 100 degrees.  *Id.* at 126.  However, Dr. Boss stated that he had been informed that Luevano was not able to flex or bend her knee at all.  *Id.*  Luevano's husband stated that she had constant pain in her left knee and could not bear weight on her left side.  *Id.*  However, the doctor's report states that "[a]s the patient left, walking down the hall the length of the building, there was minimal if any limping or obvious pain noted to the left lower extremity.  She, in fact, ambulated without crutches or any assistance whatsoever other than a slight limp."  *Id.*  Following a visit on January 15, 2003, five weeks after the surgery, Dr. Robert Pennington noted that Luevano stated that "the arthroscopy did not help and as a matter of fact, it is getting worse."  *Id.* at 125.  He stated that Luevano was unable to completely straighten her knee and that the "[r]ange of motion appears to be extremely painful."  *Id.*  Dr. Pennington opined that the arthroscopy was unremarkable and he was not sure what was causing her pain.  *Id.*  He noted that no meniscal tear was found during the arthroscopy.  *Id.*  He mentioned that he would like to see if Luevano could be referred for evaluation by a physiatrist for possible reflex sympathetic dystrophy (RSD).[7]  *Id.*

Luevano saw Dr. Jack Henry on March 13, 2003.  *Id.* at 147.  He noted that Luevano "had hamstring tightness at about 40 degrees and would extend her knee, but almost had to be forced to do so."  *Id.*  Quad atrophy was very significant on the left.  *Id.*  Dr. Henry sent Luevano to physical

---

[6] Chondromalacia refers to the "[s]oftening of any cartilage."  STEDMAN'S MEDICAL DICTIONARY at 341.

[7] A physiatrist is "[a] physician who specializes in physical medicine."  STEDMAN'S MEDICAL DICTIONARY at 1380.  Reflex sympathetic dystrophy refers to "diffuse persistent pain usually in an extremity often associated with vasomotor disturbances, trophic changes, and limitation or immobility of joints."  *Id.* at 558.  It "frequently follows some local injury."  *Id.*

therapy, which he believed was all that was needed at that time. *Id.* On April 17, 2003, Dr. Henry saw Luevano again. *Id.* at 145. He noted that she still had pain in her knee. *Id.* Also, x-rays of the knee revealed RSD. *Id.* Dr. Henry sent her to a pain clinic for the RSD. *Id.*

Dr. Nancy Alexander, who is board certified in pain medicine, examined Luevano on January 16, 2004 at the request of the Social Security Administration. *Id.* at 17, 262, 263. Measurements showed that the left extremity was smaller and cooler than the right. *Id.* at 262. The left knee appeared slightly swollen compared to the right, and Luevano "had difficulty flexing and extending the knee secondary to pain inhibition." *Id.* Dr. Alexander noted that Luevano was taking Tylenol. *Id.* In Dr. Alexander's opinion, Luevano had "a relatively clear-cut case of reflex sympathetic dystrophy or complex regional sympathetic mediated pain syndrome."[8] *Id.* at 263. Dr. Alexander opined that pain management could help Luevano's condition. *Id.* She also stated that Luevano might very well be able to be retrained and enter the workforce again. *Id.* According to Dr. Alexander, with a "hand-held assistive device," Luevano could walk one to two hours in an eight-hour workday. *Id.* at 267. She also found that sitting was not limited. *Id.*

At the hearing before ALJ Cole on November 20, 2003, Luevano testified that she often woke up at night because of pain in her knee. *Id.* at 286. In the morning, she usually tried to clean her house, but she had to sit down multiple times because of the pain. *Id.* She stated that she could not run or kneel, and she could not stand or walk for long periods of time. *Id.* at 287. She drove, did the laundry, went to the store, and visited friends. *Id.* at 287-88. Luevano said that she enjoyed knitting and ceramics painting. *Id.* at 288. When asked whether she was seeing a doctor, she stated

---

[8] Complex regional pain syndrome is another term for reflex sympathetic dystrophy. *See* WebMD, *Pain Management: Complex Regional Pain Syndrome*, at http://www.webmd.com/content/article/100/105627.htm (last visited June 28, 2006).

that she couldn't get in to see one. *Id.* at 290.  She also said that she took over-the-counter Tylenol for pain. *Id.*  She walked with a cane to alleviate some of the pain in her knee. *Id.* at 290-91.

## LEGAL STANDARDS

The standard of review in a Social Security case is whether the Commissioner's final decision is supported by substantial evidence and whether she applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  Substantial evidence is more than a scintilla; it is that evidence a reasonable mind might find adequate to support a conclusion. *Id.*  Evidence is not substantial if it is overwhelmed by other evidence in the record or is a mere conclusion. *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).   The ALJ must consider all of the medical evidence and discuss evidence that detracts from or undercuts his decision. *See Grogan*, 399 F.3d at 1262.  I must meticulously examine the record to determine whether substantial evidence supports the decision, but may not reweigh the evidence or substitute my discretion for that of the agency. *Musgrave*, 966 F.2d at 1374.

The Tenth Circuit has set out the process used to determine whether a claimant has a disability as follows:

> In order to determine whether a claimant is under a disability, the Secretary applies a five-step inquiry: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets an impairment listed in appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing his past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work.

*Id.* (citing 20 C.F.R. §§ 404.1520, 416.920 & *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988)).  If the agency finds the claimant disabled or not disabled at any point in the process, the inquiry ends. *Id.*

If a claimant is not presently engaged in substantial gainful activity and meets the threshold showing that her impairments are severe enough to interfere with her ability to do basic work activities, then the decision maker must proceed to step three. *See Williams*, 844 F.2d at 751. At step three, the decision maker "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity." *Id.* (quoting 20 C.F.R. §§ 404.1520(d), 416.920(d)). If so, then the claimant is entitled to benefits; if not, the inquiry proceeds to step four. *Id.* At step four, "the claimant must show that the impairment prevents [him] from performing work he has performed in the past." *Id.* (citations omitted) (alteration in original). The claimant is not disabled if she is able to perform past work. *Id.*

If the claimant is not able to perform past work, then she has met her burden of proof and established a prima facie case of disability. *See id.* The inquiry proceeds to step five, at which the burden of proof is shifted to the Secretary. *Id.* She must demonstrate that the claimant "retains the capacity to perform an alternative work activity and that this specific type of job exists in the national economy." *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984) (citing 42 U.S.C. § 423(d)(2)(A)). If the Secretary does not meet this burden, the claimant is entitled to benefits. *Williams*, 844 F.2d 751.

## DISCUSSION

### *Evaluation of Pain and Credibility Determination*

Luevano first argues that the ALJ erred in his evaluation of pain and his credibility determination. (Doc. 8 at 2-4.) She argues that severe pain is supported by the record, and points to nine incidents in which a medical professional noted that Luevano complained of pain. *See id.* at 2-3. She alternatively asserts that she "has established a failed knee surgery that can only result in

8

such pain consistent with current caselaw." *Id.* at 3.  She further claims that the ALJ erred by treating all of her home activities as "work" and by misinterpreting her attempts at housework as household chores.  *See id.* at 3-4.

When making a claim of disabling pain, the claimant must first prove through objective medical evidence the existence of an impairment which could reasonably be found to produce the alleged disabling pain. *Hamlin v. Barnhart*, 365 F.3d 1208, 1220 (10th Cir. 2004).  Next, she must show that there is a loose nexus between the impairment and the subjective allegations of pain, and if so, whether considering all the evidence the pain is disabling. *Id.*  "[D]isability requires more than mere inability to work without pain.  To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." *Brown v. Bowen*, 801 F.2d 361, 362-63 (10th Cir. 1986) (quotation marks and citation omitted).  A claimant's subjective complaints of pain alone are insufficient to establish disability, but they must be considered in evaluating a claim based on pain. *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990).

Credibility determinations are the province of the ALJ, and the reviewing court will not upset them when they are supported by substantial evidence. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).  However, deference is not an absolute rule. *Thompson v. Sullivan*,  987 F.2d 1482, 1490 (10th Cir. 1993).  Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings. *Kepler*, 68 F.3d at 391. *Kepler* does not require a "formalistic factor-by-factor analysis of the evidence;" the ALJ must simply "set[] forth the specific evidence he relied on in evaluating the claimant's credibility." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  Where an ALJ does not give particular reasons for discounting the claimant's credibility or gives insufficient reasons, the reviewing court is "free to view the ALJ's

conclusion with a skeptical eye." *See Talbot v. Heckler*, 814 F.2d 1456, 1461 (10th Cir. 1987) (internal quotation marks and citation omitted).

A lack of objective corroborative evidence alone is insufficient to support a credibility determination. *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004).  An ALJ may consider numerous factors, including the extensiveness of the attempts to obtain relief, the frequency of medical contacts, subjective measures of credibility that are peculiarly within the judgment of the ALJ, and the consistency or compatibility of nonmedical testimony with objective medical evidence. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

The ALJ gave adequate reasons to discount Luevano's credibility. *See id.* at 18-19.  He did not make unsupported conclusions about her credibility.  Rather, he based his credibility findings on specific observations from the medical records and Luevano's testimony. *See id.*  The ALJ found that Luevano's allegations of pain were out of proportion to the objective evidence and her testimony about her activities. *Id.* at 19.  The ALJ's decision is supported by substantial evidence.

The ALJ noted that despite Luevano's allegations of pain, "her own testimony indicates that she is able to drive, shop, cook, clean the house, and wash the dishes, although she does require the ability to sit down frequently to rest her leg." *Id.* at 18.  Luevano argues that the ALJ mistakenly relied on her attempts at doing household work. (Doc. 8 at 4.)  "[T]he ALJ may not rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain.  The sporadic performance [of household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity." *Thompson*, 987 F.2d at 1490 (citations and quotation marks omitted) (second alteration in original).  These activities therefore do not, by themselves, provide substantial evidence for the ALJ's decision.  However, these activities "may be considered, along with other

10

evidence, in determining whether a person is entitled to disability benefits." *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).  The ALJ also stated that Luevano enjoyed knitting and painting ceramics,[9] activities that "require[] significant attention and concentration."  (AR 19.)  Even assuming these recreational activities may not by themselves provide substantial evidence, they may also be considered in determining when Luevano is entitled to benefits.  *See Thompson*, 987 F.2d at 1490.

The ALJ noted that Luevano's knee was completely healed.  *Id.* at 18; *see id.* at 129.  She was prescribed physical therapy two to three times per week for four weeks, but the record reveals only four visits.  *Id.* at 18; *see id.* at 250-54.  On December 19, 2002, examination revealed flexion of 100 degrees despite Luevano's claim that she could not bend or flex the knee at all.  *Id.* at 18; *see id.* at 126.  The ALJ pointed out that "while walking, unaware that she was being observed, the claimant showed minimal, if any, limping or obvious pain in the left lower extremity.  She ambulated without crutches, a cane, or any other assistive device."  *Id.* at 18; *see id.* at 126.  The ALJ also credited the testimony of the consultative examiner, Dr. Alexander, who is board certified in pain medicine.  *Id.* at 18, 263.  She opined that Luevano might very well be able to be retrained and enter the workforce again.  *Id.* at 18; *see id.* at 267.  The ALJ referred to all of this evidence and it constitutes substantial

---

[9] Luevano argues that the transcript of the hearing before the ALJ reveals that she used to paint ceramics, but is no longer able to do so.  (Doc. 10 at 4.)  The transcript reads as follows:

Q: What kind of things do you do for recreation, for fun, just for you?

A: I knit.  I paint ceramics.  I used to (INAUDIBLE).  I can't anymore because it's so heavy and my leg doesn't help me.

(AR 288.)  Luevano seems to argue that when she stated that she "can't anymore," she was referring to painting ceramics.  However, that phrase appears to refer to what it was that she used to do but which was recorded on the transcript as "inaudible."  She clearly states that she "paint[s] ceramics."  Luevano's argument is not convincing.  The ALJ was correct in finding that Luevano painted ceramics at the time of the hearing.

evidence in support of his determination that Luevano was not credible.

The ALJ further noted that Luevano was not taking any prescription painkillers and was not seeing any physicians. *Id.* at 18; *see Luna v. Bowen*, 834 F.2d 161, 165 (10th Cir. 1987) ("The [person] who needs only aspirin surely feels less pain than the one requiring a much stronger drug."). Luevano argues that she was not taking prescription drugs or seeing a physician because she could not afford to do so. (Doc. 10 at 5-6.) In *Crawford v. Chater*, 997 F. Supp. 1387 (D. Colo. 1998), the court found that the claimant's failure to seek medical treatment was justifiable where her undisputed testimony was that she and her husband lived on her husband's social security income and she could not afford medical treatment. *Id.* at 1396.

There was no specific testimony that Luevano failed to take stronger medication because of her financial circumstances.  It was the duty of the ALJ to inquire as to whether she could afford medical care or whether any other forms of payment were available. *See Lee v. Barnhart*, 117 F. App'x 674, 681 (10th Cir. 2004) (unpublished decision).  While the ALJ did not raise the issue of whether she could afford medical care or medication when questioning her, counsel asked during her questioning of Luevano why she was not under medical care or taking prescription medication.  (AR 292-93.)  When asked why she stopped taking prescription medication, the transcript reveals that Luevano responded, "I finished it and the doctor did not (INAUDIBLE).  He didn't know what was wrong." *Id.* at 292.  Luevano also testified that she was not seeing a doctor because no doctor would see her. *Id.* at 292-93.  When asked whether she would be under a doctor's care if she had money for insurance, she stated that she would. *Id.* at 293.

In his decision, the ALJ stated that "despite her complaints of disabling pain, the claimant takes no prescription pain killers and currently sees no doctors despite the availability of the

household income of her husband's disability pension and Social Security disability benefits." *Id.* at 18.  It appears that the ALJ did not credit Luevano's testimony that she could not afford medical care.  He did not address her statements regarding her inability to schedule an appointment with a doctor.  *See Sand v. Shalala*, 820 F. Supp. 1299, 1308 (D. Kan. 1993) ("[T]he ALJ failed to consider the reasons for the frequency or infrequency of medical contacts, including perhaps financial inability to obtain medical care.").  In any event, there is still sufficient evidence to support the ALJ's decision even disregarding this evidence.

Luevano argues that she demonstrated a condition that "can only result in [severe] pain consistent with current caselaw."  (Doc. 8 at 3.)  In support, she cites *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987), and *Luna*, 834 F.2d at 164.  (Doc. 8 at 3.)  These cases do not stand for the proposition that her knee condition must necessarily cause disabling pain regardless of her credibility and other evidence.  Objective medical evidence must demonstrate an impairment that could reasonably be expected to cause the alleged pain, but this does not automatically entitle a claimant to disability benefits.  *See Gossett*, 862 F.2d at 806.  Rather, "statements regarding the intensity and persistence of the pain must be consistent with the medical findings and signs."  *Id.*  "[I]f an impairment is reasonably expected to produce *some* pain, allegations of *disabling* pain emanating from that impairment are sufficiently consistent to require consideration of all relevant evidence."  *Luna*, 834 F.2d at 164.  Luevano apparently identified an impairment that could reasonably be expected to cause some pain.  The ALJ therefore considered all relevant evidence, concluding that Luevano's claims of pain were not consistent with the evidence.  This decision is supported by substantial evidence.

### Residual Functional Capacity Determination

Luevano asserts that the ALJ erred in finding that she retained the RFC to perform sedentary work.  (Doc. 8 at 4-5.)  "In determining a claimant's physical abilities, the ALJ should 'first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis.'"  *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (quoting 20 C.F.R. § 404.1545(b)) (alterations in original).  When a claimant has a severe impairment not meeting one of the listed impairments, the ALJ must consider the limiting effects of all of the impairments, even those that are not severe, in determining the RFC.  *See* 20 C.F.R. § 404.1545(e).

In determining Luevano's RFC, the ALJ relied on the opinions of the consultative examiner, Dr. Alexander.  *Id.* at 18-19.  The ALJ found that Luevano retained the RFC to lift and carry ten pounds occasionally and less than ten pounds frequently.  *Id.* at 19.  He found that she could stand for one hour per day and sit for eight hours per day, and could never kneel or stoop.  *Id.*  As the ALJ pointed out, his RFC findings comported with Dr. Alexander's assessment, which was uncontroverted by any other medical opinion in the record and consistent with the evidence.  *Id.*

Luevano first asserts that the ALJ erred by not including pain in his RFC determination.  (Doc. 8 at 4.)  The RFC analysis includes both impairments and related symptoms, such as pain.  *See* 20 C.F.R. § 404.1545(a)(1); *Hamlin*, 365 F.3d at 1220.  "Pain, even if not disabling, is still a nonexertional impairment to be taken into consideration, unless there is substantial evidence for the ALJ to find that the claimant's pain is insignificant."  *Thompson*, 987 F.2d at 1490-91 (citations omitted).

Luevano's argument is not persuasive.  To be sure, the ALJ found that Luevano's pain was

14

not disabling; however, he did not find that it was insignificant.  He considered her allegations of pain and her credibility at length before making his RFC determination.  (*See* AR 18-19.)  Luevano's pain was "taken into consideration" by the ALJ, *see Thompson*, 987 F.2d at 1490, and her assertion to the contrary lacks merit.

Luevano claims that the ALJ should have included in the record information regarding "what psychological effect pain would have on the Plaintiff and her [RFC]."  (Doc. 8 at 4.)  She cites for this proposition *Salas v. Chater*, 950 F. Supp. 316 (D.N.M. 1996), "where the Court reasoned that 'a severe non exertional impairment must be considered as affecting the [RFC] to perform work.'" (Doc. 8 at 4 (quoting *id.* at 319).)  *Salas* involved a claimant alleged to be suffering from "*inter alia*, organic brain damage, alcoholism and low intellectual functioning," *id.* at 319, and does not provide support to Luevano here.  Luevano also cites *Harkins v. Sullivan*, 945 F. Supp. 1482, 1492 (10th Cir. 1991) [sic], in support of her assertion.  (Doc. 8 at 4.)  I can find no such case.  Luevano appears to be referring to *Harkins v. Sullivan*, No. 85-1511-C, 1990 WL 193778 (D. Kan. Nov. 6, 1990) (unpublished decision), a case involving attorney's fees in a Social Security case which does not support her position.  The ALJ properly considered pain in his determination of Luevano's RFC, relying on his credibility determination and the opinion of a pain medicine specialist.  (*See* AR 18-19.)

Luevano also specifically references her argument that the ALJ should have ordered a psychological exam as part of his duty to develop the record.  *Id.*  As explained in the next section, Luevano's argument that a psychological examination was required is not persuasive.

Luevano also asserts that the ALJ erroneously concluded that she "has limited ability to stand, sit, and stoop."  (Doc. 8 at 4.)  Her contention is not accurate.  The ALJ concluded that Luevano could sit for eight hours in an eight-hour workday.  (AR 19, 21.)  He also concluded that she could

never kneel or stoop.  *Id.*  Luevano appears to argue that the ALJ erroneously concluded that she had

a limited ability, rather than a complete inability, to stoop.  (*See* Doc. 8 at 4-5.)  However, it is clear

that the ALJ found that she could never stoop.  (AR 19, 21.)

Luevano appears to argue that her complete restriction on stooping requires a finding of

disability.  *Id.* at 4-5.  She cites for this proposition *Tyson v. Apfel*, 107 F. Supp. 2d 1267, 1269 (D.

Colo. 2000).  (Doc. 8 at 4-5.)  In that case, the court stated that Social Security Ruling 96-9p

"requires a claimant who has the residual functional capacity for less than a full range of sedentary

work to be considered disabled if her restrictions would significantly erode the occupational base for

sedentary work."  *Tyson*, 107 F. Supp. 2d at 1269.   It also stated that "[t]he ruling specifically

provides that . . . a complete inability to stoop will significantly erode the occupational base for

sedentary work and require a finding of disabled."  *Id.* at 1269-70.  Social Security Ruling 96-9p

provides in pertinent part:

> An ability to stoop occasionally; i.e., from very little up to one-third of the time, is
> required in most unskilled sedentary occupations. A complete inability to stoop would
> significantly erode the unskilled sedentary occupational base and a finding that the
> individual is disabled *would usually apply*, but restriction to occasional stooping
> should, by itself, only minimally erode the unskilled occupational base of sedentary
> work. Consultation with a vocational resource may be particularly useful for cases
> where the individual is limited to less than occasional stooping.

S.S.R. 96-9p, 1996 WL 374185, at *8 (emphasis added).

I disagree that Ruling 96-9p requires a finding of disability if the claimant has a complete

inability to stoop.  Rather, such a finding would *usually* be required.  *See* S.S.R. 96-9p.  "There may

be a number of occupations from the approximately 200 occupations administratively noticed, and

jobs that exist in significant numbers, that an individual may still be able to perform even with a

sedentary occupational base that has been eroded."  *Id.* at *4.  In *Mullens v. Barnhart*, 165 F. App'x

16

611 (10th Cir. 2006) (unpublished decision), the claimant, relying on Ruling 96-9p, argued that he should be found disabled because of his inability to stoop. *Id.* at 613. However, the court held that the rule did not require such a result in all cases and noted that the VE testified that there were jobs that the claimant could perform despite his limitations. *Id.* at 614. The court held the ALJ's analysis to be proper "[i]n light of the [VE's] testimony regarding the availability of sedentary jobs that require no stooping." *Id.* at 614-15.

In this case, as in *Mullens*, the ALJ followed the procedure that the rule recommends: consulting a VE to determine whether there are occupations that the claimant can perform despite an inability to stoop. *See* S.S.R. 96-9p. The hypothetical questions posed to the VE clearly stated that the worker could never stoop. (*See, e.g.*, AR 112-115.) The VE determined that even with the complete restriction on stooping there are sedentary occupations in the national economy that a hypothetical worker with Luevano's relevant characteristics could perform. *Id.* at 113. She gave at least two examples--a sewing machine operator and an eyeglass assembler--and demonstrated that these jobs exist in the national economy. *Id.*; *see Channel*, 747 F.2d at 579. Luevano's inability to stoop does not require a finding that she is disabled.

Luevano asserts that the "fundamental error in the ALJ's analysis is that no weight whatsoever was given to the Plaintiff's inability to communicate in the English language and the need to consider the GRIDS." (Doc. 10 at 2.) Because Luevano raised this argument for the first time in her reply, I will not address it. *See Acker v. Burlington N. & Santa Fe Ry. Co.*, 388 F. Supp. 2d 1299, 1302 n.2 (D. Kan. 2005) (citing *Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003) & *Coleman v. B-G Maint. Mgmt.*, 108 F.3d 1199, 1205 (10th Cir. 1997)).

### *Development of the Record*

Luevano argues that the ALJ failed to adequately develop the record.  (Doc. 8 at 5.)  She claims that he should have ordered a psychological evaluation because of the severity of her pain.  *Id.*  She argues that the ALJ should have been aware of the need for an evaluation because she was tearful during the consultative examination and during a medical visit approximately a year later.  *Id.*; *see id.* at 262, 279.  She also contends that her treating physician recommended a psychological evaluation.  *Id.*; *see id.* at 152.

While the claimant has the burden of demonstrating that she is entitled to benefits, a social security disability hearing is nevertheless a nonadversarial proceeding.  *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).  Therefore, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."  *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *see Madrid*, 447 F.3d at 790.  The ALJ's "basic duty of inquiry" requires him "'to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts.'"  *Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987) (quoting *Heckler v. Campbell*, 461 U.S. 458, 471, 471 n.1 (1983) (Brennan, J., concurring)).

"The Secretary has broad latitude in ordering a consultative examination."  *Diaz v. Sec'y of Health and Human Servs.*, 898 F.2d 774, 778 (10th Cir. 1990).  "[T]he ALJ should order a consultative exam when evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability."  *Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir. 1997).  The duty to develop the record extends to impairments that the ALJ may become aware of

during the administrative hearing.  *Carter v. Chater*, 73 F.3d 1019, 1021-22 (10th Cir. 1996).

At her consultative examination on January 16, 2004, Luevano "display[ed] a tearful affect" (AR 262); at a visit to Dr. Alexander on January 26, 2005, she was "somewhat tearful," *id.* at 279. The ALJ denied Luevano benefits on January 21, 2005.  *Id.* at 22.  The report of the January 26, 2005 visit thus occurred after the ALJ made his decision.  I need not consider this evidence in determining whether the ALJ's decision was proper.  It is true that evidence not before the ALJ may be presented to the Appeals Council and "becomes part of the administrative record to be considered when evaluating the Secretary's decision for substantial evidence."  *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994).  However, this "new evidence" must relate to the period on or before the date of the ALJ's decision.  *See id.* at 858; 20 C.F.R. § 404.970(b) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.").

Luevano has only identified one incident prior to the ALJ's decision where Luevano was noted as being tearful.  That Luevano was tearful at one of her medical visits while being seen for what she alleges was an extremely painful condition does not establish "the reasonable possibility of the existence of a disability."  See *Hawkins*, 113 F.3d at 1169.  She did not allege any mental impairments nor did she complain of psychological symptoms to her doctors.  There was no suggestion at the hearing that she had a mental impairment.  Luevano's argument that her treating doctors recommended a psychological evaluation is not accurate.  Contrary to Luevano's assertions, Dr. Pennington recommended referral to a physiatrist, not a psychiatrist.  (*See* AR 152.)  A physiatrist is "[a] physician who specializes in physical medicine."  STEDMAN'S MEDICAL DICTIONARY at 1380. There is no evidence that Dr. Pennington thought Luevano needed a psychological evaluation.

19

### The ALJ's Hypothetical Questions

Luevano argues that the ALJ erred by presenting faulty or defective questions to the VE. (Doc. 8 at 5.) She appears to argue that the questions did not properly reflect the extent of her pain and her posture limitations. *Id.* at 5-6. She also contends that the ALJ should have included questions about her alleged mental impairment. *Id.* at 6.

The hypothetical questions must reflect the claimant's impairments and her limitations as supported by the evidence in the record. *See Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996). Hypothetical inquiries "must include all (and only) those impairments borne out by the evidentiary record." *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995). "[T]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision." *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (quotation marks and citation omitted) (alteration in original).

Luevano appears to assert that the ALJ erred by not considering her allegations of pain in the hypothetical questions. (*See* Doc. 8 at 5-6.) Pain that is not disabling but not insignificant should be taken into account in the RFC finding, *see Thompson*, 987 F.2d at 1490-91, and as noted above, the ALJ did so in this case. Because pain was properly considered in the RFC determination, there was no need to include it in the questions to the VE. In *Herrera v. Barnhart*, 69 F. App'x 438 (10th Cir. 2003) (unpublished decision), the claimant alleged that the ALJ did not mention his back and hand pain in the hypothetical questions. *Id.* at 441. The court stated that the ALJ assessed the effect of pain on the RFC, found the allegations of pain not fully credible, and determined that the claimant had no limitations on the ability to sit, stand, or walk. *Id.* The court noted that the hypothetical question reflected that lack of limitation and was consistent with the RFC determination. *Id.* It held that the

hypothetical "adequately reflected the ALJ's conclusions concerning the effect of pain on appellant's ability to work." *Id.*   Here, as in *Herrera*, the ALJ properly considered pain when determining Luevano's RFC and accurately conveyed her limitations in the hypothetical questions.  As such, he did not err by not referring to pain in the hypotheticals.

Luevano also argues that the questions were faulty or defective because the ALJ (1) erred in his evaluation of pain and posture limitations, and (2) failed to include in the hypotheticals information about the mental impairment he should have recognized and for which he should have ordered a psychological consultative examination.  (Doc. 8 at 5-6.)  I have concluded that the ALJ's evaluation of pain was proper and that no psychological examination was required.  Luevano's arguments therefore lack merit.

**CONCLUSION**

IT IS ORDERED that Luevano's Motion to Reverse Administrative Decision or, in the Alternative, a Remand of Said Decision (Doc. 7) is DENIED.

IT IS SO ORDERED.

WILLIAM P. LYNCH
UNITED STATE MAGISTRATE JUDGE

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.

117 Fed.Appx. 674, 2004 WL 2810224 (C.A.10 (Okla.)), 102 Soc.Sec.Rep.Serv. 1
**(Cite as: 117 Fed.Appx. 674)**

[Briefs and Other Related Documents](#)
This case was not selected for publication in the Federal Reporter.Please use FIND to look at the applicable circuit court rule before citing this opinion. Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)
United States Court of Appeals,Tenth Circuit.
Michael G. LEE, Plaintiff-Appellant,
v.
Jo Anne B. BARNHART, Commissioner of Social Security Administration, Defendant-Appellee.
No. 03-7025.

Dec. 8, 2004.

**Background:**  Claimant appealed from order of the United States District Court affirming the denial by the Commissioner of Social Security Administration of his application for Social Security disability and Supplemental Security Income benefits (SSI).

**Holdings:**  The Court of Appeals, O'Brien, Circuit Judge, held that:

1(1) administrative law judge (ALJ) improperly relied on inadequately supported agency medical consultant's opinion in determining that claimant's impairment was not "severe," and

2(2) ALJ failed to properly develop claimant's medical record.

Reversed and remanded.

West Headnotes

**[1] Social Security and Public Welfare 356A 143.65**

356A Social Security and Public Welfare
    356AII Federal Insurance Benefits in General
        356AII(C) Procedure
            356AII(C)2 Evidence
                356Ak143.30 Disability Claims, Evidence as to
                    356Ak143.65 k. Medical Evidence of Disability, Sufficiency. Most Cited Cases

Administrative law judge's (ALJ) finding that claimant's narcolepsy and dysthymic disorder were not "severe," as required for claimant to obtain Social Security disability and Supplemental Security Income benefits (SSI), was improper in that it was based on inadequately supported agency medical consultant's opinion; consulting physician had not examined claimant, made incorrect statements regarding claimant's history of treatment and medication, and relied only on those portions of examining source's report of which were favorable to agency's position, ignoring detailed statements regarding claimant's narcolepsy and conclusion that claimant had global assessment of functioning (GAF) score suggesting inability to keep a job. 20 C.F.R. § § 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c).

**[2] Social Security and Public Welfare 356A 142.5**

356A Social Security and Public Welfare
    356AII Federal Insurance Benefits in General
        356AII(C) Procedure
            356AII(C)1 Proceedings in General
                356Ak142.5 k. Hearing and Administrative Review. Most Cited Cases

Administrative law judge (ALJ) failed to properly develop claimant's medical record, which lacked findings and test results pertinent to his claim for Social Security disability and Supplemental Security Income benefits (SSI), as required after claimant alerted ALJ to missing records by submitting billing records for evaluations and diagnostic test, and through his testimony at hearing regarding his having been diagnosed with narcolepsy and prescribed medication for it.

**[3] Social Security and Public Welfare 356A 142.5**

356A Social Security and Public Welfare
    356AII Federal Insurance Benefits in General
        356AII(C) Procedure
            356AII(C)1 Proceedings in General
                356Ak142.5 k. Hearing and Administrative Review. Most Cited Cases

Administrative law judge (ALJ) improperly ordered two consultative examinations as substitute for record from claimant's treating physician which claimant for Social Security disability and Supplemental Security

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Income benefits (SSI) alerted him was missing from medical record.  Social Security Act, § 223(d)(5)(B), as amended, 42 U.S.C.A. § 423(d)(5)(B).

**[4] Social Security and Public Welfare 356A 142.5**

356A Social Security and Public Welfare
   356AII Federal Insurance Benefits in General
      356AII(C) Procedure
         356AII(C)1 Proceedings in General
            356Ak142.5 k. Hearing and Administrative Review. Most Cited Cases
Administrative law judge (ALJ) improperly restricted his development of medical record to twelve-month period preceding date of claimant's application for Social Security disability and Supplemental Security Income benefits (SSI); despite having been alerted to missing records regarding diagnostic test and medical treatment which were dated prior to twelve-month period, ALJ repeatedly referred to lack of medical evidence in his decision denying benefits, and ALJ relied on claimant's lack of medical treatment for finding that claimant's statements concerning his impairments were not credible.  Social Security Act, § 223(d)(5)(B), as amended, 42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d), 416.912(d).

**[5] Social Security and Public Welfare 356A 142.5**

356A Social Security and Public Welfare
   356AII Federal Insurance Benefits in General
      356AII(C) Procedure
         356AII(C)1 Proceedings in General
            356Ak142.5 k. Hearing and Administrative Review. Most Cited Cases
Claimant's explanation at hearing, in connection with his application for Social Security disability and Supplemental Security Income benefits (SSI), that he had not received medical treatment for financial reasons, not because he did not have severe impairment, triggered duty on part of administrative law judge (ALJ) to determine whether financial reasons in fact explained claimant's failure to seek treatment, a duty ALJ failed to discharge properly; claimant testified that he had no income at time of hearing, and had had none since last time he worked, and stated he did not know where he could go for medical treatment free of cost.

**\*675** Catherine Georgette Zilahy, Boesche Legal Clinic University of Tulsa Law School, Tulsa, OK, for Plaintiff-Appellant.
Cheryl R. Triplett, Office of the United States Attorney, Eastern District of Oklahoma, Muskogee, OK, Tina M. Waddell, Michael Mcgaughran, Office of

the General Counsel, Dallas, TX, for Defendant-Appellee.

Before O'BRIEN and BALDOCK, Circuit Judges, and BRORBY, Senior Circuit Judge.

**ORDER AND JUDGMENT**[FN*]

> [FN*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3. O'BRIEN, Circuit Judge.

**\*\*1** After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument.  *See* Fed. R.App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.

Plaintiff-appellant Michael G. Lee appeals from an order of the district court affirming the Commissioner's decision denying his application for Social Security disability and Supplemental Security Income benefits (SSI).  Appellant filed for these benefits on January 13, 2000.  He alleged disability since March 11, 1999, based on narcolepsy and depression.  The agency denied his applications initially and on reconsideration.

On October 4, 2001, Mr. Lee received a de novo hearing before an administrative law judge (ALJ). The ALJ determined that appellant did not have a "severe impairment" as defined in the Social Security regulations, *see* 20 C.F.R. § § 404.1521, 416.921, and was therefore not entitled to benefits.  The Appeals Council denied review, making the ALJ's determination the Commissioner's final decision.

We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.  *See Andrade v. Sec'y of Health & Human Servs.,* 985 F.2d 1045, 1047 (10th Cir.1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Fowler v. Bowen,* 876 F.2d 1451, 1453 (10th Cir.1989) (quotations omitted).

The Commissioner follows a five-step sequential evaluation process to determine whether a claimant is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

disabled.  *See Williams v. Bowen,* 844 F.2d 748, 750-52 (10th Cir.1988).  The claimant bears the burden of establishing a prima facie case of disability at steps one through four.  *See id.* at 751 n. 2.  Here, the ALJ denied benefits at step two.

At step two, the agency determines whether the claimant's alleged impairment(s) are "severe."  20 C.F.R. § § 404.1520(a)(4)(ii), (c); 416.920(a)(4)(ii), (c).  "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  *Id.* § § 404.1521(a); 416.921(a).  Only "slight" impairments, imposing only a "minimal effect on an individual's ability to work" are considered "not severe:"

An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at [step two] when medical evidence establishes only a *slight abnormality or a combination of slight abnormalities* which would have *no more than a minimal effect* on an individual's ability to work even if the individual's age, education, or work experience were specifically considered[.]

Social Security Ruling 85-28, 1985 WL 56856, at *3 (emphasis added).  *See also* SSR 03-3p, 2003 WL 22813114, at *2.

**\*\*2** In light of these definitions, case law prescribes a very limited role for step two *\*677* analysis.  Step two is designed to "weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory definition of disability."  *Bowen v. Yuckert,* 482 U.S. 137, 156, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (O'Connor, J., concurring).  *See also Langley v. Barnhart,* 373 F.3d 1116, 1123 (10th Cir.2004).  While "the mere presence of a condition or ailment" is not enough to get the claimant past step two, *Hinkle v. Apfel,* 132 F.3d 1349, 1352 (10th Cir.1997), a claimant need only make a "de minimus" showing of impairment to move on to further steps in the analysis, *Langley,* 373 F.3d at 1123.

On appeal, Mr. Lee raises two issues.  He argues that the ALJ failed to recognize his severe impairments, and that he failed to properly and fully develop the record.  We reverse and remand for further proceedings.

## 1. Narcolepsy and depression as severe impairments

The ALJ concluded that "[t]he medical evidence of record establishes the existence of narcolepsy and dysthymic disorder."  Aplt.App. at 22.  The Merck Manual describes narcolepsy as follows:  "A rare syndrome of hypersomnia with sudden loss of muscle tone (cataplexy), sleep paralysis, and hypnagogic phenomena."  The Merck Manual of Diagnosis and Therapy 1413 (17th ed.1999).  The Merck Manual goes on to say that "the symptoms may put the patient in danger, often interfere with work and social relationships, and can drastically reduce quality of life."  *Id.* at 1414.  Mr. Lee's other mental impairment, dysthymia, is a sort of low-grade, long-lasting form of depression.  *Id.* at 1538-39.

The agency regulations lay out the process for evaluation of mental impairments.  *See* 20 CFR § 404.1520a;  416.920a.  The agency is required "to consider ... all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation."  *Id.* § § 404.1520a(c)(1); 416.920a(c)(1).  The claimant's impairment is then rated by its effect on four functional areas: activities of daily living;  social functioning;  concentration, persistence, or pace;  and episodes of decompensation.  *Id.* § § 404.1520a(c)(3);  416.920a(c)(3).  The ALJ is required to document his evaluation of these functional factors in the body of his decision, *id.* § § 404.1520a(e);  416.920a(e), making specific findings as to the evidence relied upon, and the degree of limitation in each of these areas, *id.* § § 404.1520a(e)(2);  416.920a(e)(2).

The ALJ applied this four-part test to conclude that neither Mr. Lee's narcolepsy nor his dysthymic disorder, nor the combination thereof, was "severe" within the meaning of step two.[FN1]  In fact, the ALJ found that Mr. Lee's mental conditions caused him *no* limitations in activities of daily living;  social functioning;  concentration, persistence, or pace;  and episodes of decompensation.  Aplt.App. at 22.  In theory, this means that Mr. Lee can do any sort of work available in the economy for which he is qualified, including driving a truck or working around machinery.  The ALJ reached this conclusion, in spite of evidence that Mr. Lee's narcolepsy causes him uncontrolled bouts of sleepiness, *see id.* at 109 (report of Dr. Mynatt), and despite uncontroverted testimony from Mr. Lee that he had been fired from various jobs because he could not control the sleepiness his narcolepsy caused, *id.* at *678 164, and that he could not even cook at home for fear of starting a fire if he involuntarily fell asleep, *id.* at 168.

---

FN1.  It might seem, at first glance, that "narcolepsy" is a physical, rather than mental condition.  It is, however, listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) as a mental disorder.  *See* DSM-IV-TR at 609-15 (4th ed.2000).

**\*3** [1] In reaching his conclusions, the ALJ did very little of the required mental impairment analysis, relying instead wholesale upon a psychiatric review technique (PRT) form completed by the agency's Dr. Kampschaefer, *see id.* at 117-30, and a one-page "medical consultant review form" completed by an agency medical consultant, *id.* at 116.   An ALJ is bound by the opinions of agency medical consultants only insofar as they are supported by evidence in the case record.   Social Security Ruling 96-6P, 1996 WL 374180, at \*2. It follows that if the ALJ relies heavily on such opinions, as the ALJ did here, the opinions must themselves find adequate support in the medical evidence.

Dr. Kampschaefer did not examine Mr. Lee. He relied on an earlier examination by consulting physician Dr. Mynatt.   *See* Aplt.App. at 109-10.   In his PRT form, Dr. Kampschaefer focused primarily on Mr. Lee's diagnosis of dysthymia.   *Id.* at 117, 127.   He stated, incorrectly, that Mr. Lee had no history of treatment or medication for his narcolepsy.   *Id.* at 129.   He also relied only on those portions of Dr. Mynatt's report favorable to the agency's position, ignoring Dr. Mynatt's detailed statements about Mr. Lee's narcolepsy and also his statement that Mr. Lee "has out of body experiences where he hears people talking and feels he should be part of the action but he is unable to participate." *Id.* at 109.   Dr. Kampschaefer might, of course, have concluded that these statements were unworthy of belief, but there is no indication in his PRT form that he did or why he would have rejected them.   Nor was Dr. Kampschaefer, who did not examine Mr. Lee, in a position to dispute conclusions that Dr. Mynatt reached based on examination.

There is also no discussion in Dr. Kampschaefer's report of Dr. Mynatt's conclusion that Mr. Lee's present Axis V LOF (level of functioning or global assessment of functioning score) is 48.   *Id.* at 110.   "The GAF is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning."   *Langley,* 373 F.3d at 1122 n. 3 (quotation omitted).   The DSM-IV-TR, the diagnostic Bible of mental disorders, explains that a GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, inability to keep a job)." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed.2000).[FN2]

> FN2.   The ALJ's discussion of Dr. Mynatt's findings similarly omits any reference to the more serious statements in his report.   Aplt.App. at 21.   An ALJ may not simply pick out portions of a medical report that favor denial of benefits, while ignoring those favorable to disability.   *Switzer v. Heckler,* 742 F.2d 382, 385-86 (7th Cir.1984).

Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work.   *Eden v. Barnhart,* 109 Fed.Appx. 311, 314 (10th Cir.2004) (unpublished).   The claimant's impairment, for example, might lie solely within the social, rather than the occupational, sphere.   A GAF score of fifty or less, however, does suggest an inability to keep a job.   *Oslin v. Barnhart,* 69 Fed.Appx. 942, 947 (10th Cir.2003) (unpublished).   In a case like this one, decided at step two, the GAF score should not have been ignored.

**\*4** The other exhibit on which the ALJ relied, the one-page medical consultant review form, is essentially a check-off form **\*679** where the medical consultant marks a series of boxes and provides a brief explanation of his conclusions.   *See* Aplt.App. at 116.   This court considers such forms of dubious value, when not accompanied by "thorough written reports or testimony." *Hamlin v. Barnhart,* 365 F.3d 1208, 1223 (10th Cir.2004);   *Frey v. Bowen,* 816 F.2d 508, 515 (10th Cir.1987) (quotations omitted).   In sum, the opinions of Dr. Kampschaefer and the unnamed consultant are inconsistent with the medical evidence of record from examining source Dr. Mynatt, and the ALJ has failed to explain or to reconcile this discrepancy.

## 2. **Development of the medical evidence**

[2] In his decision, the ALJ states "[t]his is a very thin medical exhibit file, and the claimant has never actually received any medical treatment for his allegedly disabling impairments."   Aplt.App. at 21. This statement is troublesome, for two reasons.   First, the ALJ made no effort to develop the medical record, even though there were ample clues that significant portions of it are missing and that these records would likely show that Mr. Lee did receive medical treatment for narcolepsy.   Second, Mr. Lee explained at the hearing that he had not received medical treatment for financial reasons, not because he did not have a severe impairment.   This triggered a duty on the part of the ALJ to determine whether financial reasons in fact explained Mr. Lee's failure to seek treatment, a duty the ALJ failed to discharge properly.

### a. **Prior medical evaluation and treatment**

Although Mr. Lee was evaluated by a Dr. Wiggs of Norman Neurology for narcolepsy in 1991 and 1992, and apparently received an EEG during that time

period, the record does not contain any of Dr. Wiggs' records, other than three pages of billing records that do not include any pertinent findings or test results. *Id.* at 101-03. We can tell from these billing records that Mr. Lee paid Dr. Wiggs over $300 for two evaluations and the EEG. Presumably, he received some sort of diagnostic results for this sum. The record contains nothing from Mr. Lee's chart, however, other than these bookkeeping records.

The absence of detailed records from Dr. Wiggs cannot be laid at the feet of Mr. Lee. By submitting the billing records, and through his testimony at the hearing, Mr. Lee alerted the ALJ to the missing records, and the need to obtain them to develop a complete record. At the hearing, in the ALJ's presence, Mr. Lee was asked:
Q. Okay. As far as the narcolepsy, when were you first diagnosed with that?
A. In 91.
Q. Okay.... [W]ho diagnosed you? Which doctor?
A. Dr. Wiggs.

*Id.* at 164-65.

The ALJ also asked Mr. Lee whether he was aware of the medications available for narcolepsy. He replied that he had been prescribed Ritalin, but the side effects bothered him. *Id.* at 171. Thus, the ALJ was made aware (1) that Mr. Lee had been diagnosed with narcolepsy, and (2) that he had been prescribed medication for it. Neither the diagnosis nor the prescription appears in the paltry medical evidence contained in the administrative record, however. This undermines the ALJ's statements about the thin medical file and Mr. Lee's failure to seek treatment.

**5 The ALJ has an affirmative obligation to develop the record by obtaining missing medical records that the claimant brings to *680 his attention. *Carter v. Chater,* 73 F.3d 1019, 1022 (10th Cir.1996).* The agency argues in its brief that the ALJ fulfilled this duty by ordering two consultative examinations, and by developing the records that date from the twelve-month period preceding the date of Mr. Lee's application (i.e., none). Each of these rationales is problematic.

[3] First, consultative examinations are no substitute for records from a claimant's treating physician. The relevant statutes specifically provide that "[i]n making any determination the Commissioner of Social Security shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) *all medical evidence,* including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis." 42 U.S.C. § 423(d)(5)(B) (emphasis added). [FN3]

FN3. Since Dr. Wiggs saw Mr. Lee only a few times, and his records were nearly ten years old, it is possible that Dr. Wiggs was not Mr. Lee's "treating physician" within the meaning of the Act. *See Doyal v. Barnhart,* 331 F.3d 758, 762-63 (10th Cir.2003) (discussing definition of "treating physician"). The ALJ did not rely on this rationale, however, and any findings necessary on this point can be made on remand. *See, e.g., SEC v. Chenery Corp.,* 318 U.S. 80, 87-88, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (stating reviewing court should not make findings committed to agency).

[4] Second, the "twelve month" rationale is not intended to preclude resort to pertinent evidence outside the twelve-month period, essential to a determination of disability. The statute says the Commissioner "shall develop a complete medical history of *at least* the preceding twelve months for any case in which a determination is made that the individual is not under a disability." 42 U.S.C. § 423(d)(5)(B) (emphasis added). If there is "reason to believe that development of an earlier period is necessary," the Commissioner should develop records pertaining to that period as well. 20 C.F.R. § 404.1512(d); 416.912(d).

The twelve-month rationale is entirely out of place in a case like this one where (1) the ALJ relies on the claimant's failure to seek treatment; (2) the ALJ relies on the lack of medical signs or findings to corroborate the claimant's assertions of a severe impairment; and (3) records that bear on the issue of disability from a doctor who may be claimant's treating physician are missing from the record. The ALJ's decision is filled with references to lack of medical evidence to substantiate Mr. Lee's claim of a severe impairment, each of which is valid only if this court ignores the ALJ's failure to develop the record and blinds itself to the evidence that Mr. Lee received an EEG study and medication for narcolepsy. The ALJ stated that "the claimant has never actually received any medical treatment for his allegedly disabling impairments," Aplt.App. at 21; that "someone with a condition as severe and of such long duration as is alleged by the claimant would occasionally seek some medical care," *id.* at 22; that there are no "medical signs and findings" established by "medically acceptable diagnostic techniques" to support Mr. Lee's disability claim, *id.* at 23; and that Mr. Lee's statements concerning his impairments are not credible "in light of the absence of any medical treatment," *id.*

**6 Admittedly, Mr. Lee did not receive any medical treatment after the alleged onset date. [FN4] Here, however, we run into a second, *681 more serious

problem.   Small as it is, the record contains at least two references to Mr. Lee's inability to afford medical care.   *See id.* at 109, 168.   This provides an alternative explanation, other than lack of a severe impairment, for Mr. Lee's failure to obtain treatment.

> FN4.  At one point in his decision, the ALJ did get it right.   He limited his "lack of treatment" analysis to the time period following the alleged onset date.   Aplt.App. at 22 ("To summarize, since the day that the claimant alleges that he became disabled, on March 11, 1999, he has *never* sought or received any medical treatment from anyone, for anything.").

**b. Failure to pursue medical treatment**

In order to rely on the claimant's failure to pursue treatment as support for a finding of noncredibility, the ALJ should consider four factors:  "(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused;  and, if so, (4) whether the refusal was without justifiable excuse." *Thompson v. Sullivan,* 987 F.2d 1482, 1490 (10th Cir.1993).   This analysis applies to cases in which the claimant fails to pursue medical treatment because he cannot afford it.   *See id.* at 1489-90.

[5]  The ALJ stated in his decision in this case that "[t]he claimant has provided no persuasive evidence that he has been refused medical treatment or pain medication due to an inability to pay, or that he has sought alternative payment plans with any physician."  Aplt.App. at 22.  Here, the ALJ put the shoe on the wrong foot;  it was *his* duty to inquire, as part of development of the record, whether Mr. Lee could in fact afford treatment and whether any alternative forms of payment were available to him.   *See, e.g., Neil v. Apfel,* No. 97-7134, 1998 WL 568300, at *3 (10th Cir. Sept.1, 1998) (unpublished) (citing *Thompson,* 987 F.2d at 1492).  Mr. Lee testified that he had *no* income at the time of the hearing, and had had none since the last time he worked.   Aplt.App. at 168-69.   The ALJ later asked Mr. Lee if he had looked into places where he could get medical treatment free of cost;  Mr. Lee stated he didn't know where to go for such services. *Id.* at 170.

Mr. Lee's only source of income was the interest he earned on his ten dollar savings account in the bank.  Aplt.App. at 135.  He lives at his mother's home.  *Id.* at 168.  He told Dr. Mynatt that he would like to have medical treatment but neither he nor his family can afford it.  *Id.* at 109.   All the evidence in the record suggests that Mr. Lee is severely impoverished, and that he simply cannot afford treatment.   Dr. Mynatt found that Mr. Lee was honest in giving information

regarding his medical history, *id.* at 110, and Dr. Clark found him "reliable," *id.* at 104.    There is no indication that Mr. Lee exaggerated his symptoms when he saw the two medical consultants.

It may be that upon a full consideration of all the vocational factors applicable in this case, the Commissioner would determine that Mr. Lee was not disabled.   Here, however, the ALJ cut short the analysis, and made this determination at step two.  He relied on impermissible factors in doing so.

**\*\*7** The judgment of the district court is REVERSED and this case is REMANDED with instructions to remand to the agency for further proceedings in accordance with this order and judgment.

C.A.10 (Okla.),2004.
Lee v. Barnhart
117 Fed.Appx. 674, 2004 WL 2810224 (C.A.10 (Okla.)), 102 Soc.Sec.Rep.Serv. 1

Briefs and Other Related Documents (Back to top)

• 2003 WL 24136170 (Appellate Brief) Brief for Appellee (May. 12, 2003) Original Image of this Document (PDF)

• 2003 WL 24136171 (Appellate Brief) Brief of Plaintiff/Appellant, Michael G. Lee (Apr. 07, 2003) Original Image of this Document (PDF)

• 03-7025 (Docket) (Feb. 26, 2003)

END OF DOCUMENT

Briefs and Other Related Documents

This case was not selected for publication in the Federal Reporter. Please use FIND to look at the applicable circuit court rule before citing this opinion. Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)

United States Court of Appeals, Tenth Circuit.

Donal R. MULLENS, Plaintiff-Appellant,

v.

Jo Anne B. BARNHART, Commissioner, Social Security Administration, Defendant-Appellee.

**No. 04-7132.**

Feb. 1, 2006.

**Background:** Applicant for Social Security disability benefits sought review of decision of Commissioner of Social Security denying benefits. The United States District Court for the Eastern District of Oklahoma affirmed, and applicant appealed.

**Holding:** The Court of Appeals, Kelly, Circuit Judge, held that substantial evidence supported ALJ's finding that applicant was not disabled based on back disorders and myoneural disorders.

Affirmed.

West Headnotes

**Social Security and Public Welfare 356A 143.80**

356A Social Security and Public Welfare
    356AII Federal Insurance Benefits in General
        356AII(C) Procedure
            356AII(C)2 Evidence
                356Ak143.30 Disability Claims, Evidence as to
                    356Ak143.80 k. Capabilities and Employment Opportunities, Sufficiency. Most Cited Cases

Substantial evidence supported ALJ's finding that applicant for Social Security disability benefits was not disabled based on back disorders and myoneural disorders within meaning of Social Security Act; although Social Security Ruling stated that an inability to stoop would usually mean an individual was disabled, vocational expert (VE) testified that jobs existed in state and national economy that applicant could perform with his limitations, and VE gave examples of such jobs, including cashier, surveillance system monitor, and food and beverage order clerk.

**\*612** Ennifer L. Struble, Tulsa, OK, for Plaintiff-Appellant.
Cheryl R. Triplett, Office of the United States Attorney Eastern District of Oklahoma, Muskogee, OK, Kesha

G. Simmons, Tina M. Waddell, Office of the General Counsel Social Security Administration, Michael McGaughran, Social Security Administration Office of the General Counsel, Dallas, TX, for Defendant-Appellee.

Before KELLY, McKAY, and McCONNELL, Circuit Judges.

**ORDER AND JUDGMENT**FN*

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3. PAUL J. KELLY, JR., Circuit Judge.

**\*\*1** After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument.  See Fed. R.App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.

Plaintiff-appellant Donal Mullens appeals from an order of the district court affirming the Commissioner's decision denying his application for Social Security disability benefits.   Mr. Mullens applied for these benefits on July 26, 2002, alleging disability since December 27, 1999, based on disorders of the back and myoneural disorders.   The agency denied his applications initially and on reconsideration.

On April 2, 2003, Mr. Mullens received a de novo hearing before an administrative law judge (ALJ). The ALJ found that Mr. Mullens's impairments were severe but did not meet the criteria of any of the impairments listed in 20 C.F.R., Pt. 400, Subpt.   P, App. 1. The ALJ determined that Mr. Mullens could not return to his past relevant work as a machine tender, forklift operator, and warehouse worker, types of work classified as unskilled to semi-skilled and light to medium work, but that he retained the residual functional capacity (RFC) to perform sedentary work "with no bending forward from the waist and no extension of the neck."   Aplt.App. at 16.   The ALJ also found that while direct application of the sedentary work portion of the Medical-Vocational Guidelines, see 20 C.F.R. Pt. 404, Subpt.   P, App. 2, rule 201.21 (the grids), would direct a finding of not disabled, direct application was not allowed because Mr. Mullens could not "do the full range of sedentary work," due to the non-exertional restrictions on stooping and extending his neck.   Aplt.App. at 17.

The ALJ stated that he was therefore using the grids "as a framework for decision making with vocational expert opinion on the issue of the existence of jobs for **\*613** which a hypothetical individual such as the claimant can perform." *Id.*

At the hearing, the ALJ had presented a vocational expert (VE) with Mr. Mullens's exact limitations and asked if there were unskilled jobs in the national economy that could be performed within the limits of Mr. Mullens's RFC. The VE testified that there were such jobs and presented three examples, one in the light exertion classification-cashier II-and two in the sedentary exertion classification-surveillance system monitor and food and beverage order clerk. The VE also testified that a significant number these jobs existed both in Oklahoma and nationally, and confirmed on cross-examination that "[s]tooping [was] absolutely not required at all in those two jobs." *Id.* at 245. No evidence was presented to dispute this opinion. The ALJ "[found] this expert opinion persuasive in showing that jobs exist in significant numbers in the national economy which the claimant can do," *id.* at 17, and held that Mr. Mullens was not disabled within the meaning of the Social Security Act. The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision.

**\*\*2** Mr. Mullens filed his complaint with the district court, arguing that Social Security Ruling 96-9p directed that his inability to stoop precluded all jobs in the national economy. During his hearing in front of the ALJ, Mr. Mullens's attorney had argued that SSR *96-6p* directed that the inability to stoop precluded all jobs in the national economy. The ALJ stated in his ruling that he had examined SSR 96-6p and was convinced that it did not require a finding of disabled. Before the district court, Mr. Mullens argued that his attorney had erred and that it was actually SSR *96-9p* that stated that the inability to stoop precluded all jobs in the national economy and that the ALJ was responsible for knowing and applying all of the social security rulings.

The magistrate judge found that neither circuit case law nor SSR 96-9p require a decision of disabled where a claimant is unable to stoop and that, instead, the proper course of action is to consult a VE and consider the claimant's individual limitations. The magistrate judge found that this was the procedure followed by the ALJ, ruled that the decision of the Commissioner was supported by the substantial evidence of the VE's testimony, and recommended to the district court that the Commissioner's ruling be affirmed.

Mr. Mullens filed an objection to the magistrate judge's findings and recommendation, arguing that the magistrate judge did not "adequately consider [Mr. Mullens's] argument that the [ALJ] erred by failing to apply Social Security Ruling 96-9p." Aplt.App. at 271. The basis for his complaint was a continued insistence that SSR 96-9p "requires that an individual limited to unskilled sedentary work with the added restriction prohibiting stooping be found disabled" and because Mr. Mullens falls within this category he "should have been found disabled." *Id.* The district court, in a concise order, overruled Mr. Mullens's objection, adopted the findings and recommendation of the magistrate judge, and affirmed the Commissioner's ruling. Mr. Mullens appeals this decision.

The Commissioner follows a five-step sequential evaluation process to determine whether a claimant is disabled. *See Williams v. Bowen,* 844 F.2d 748, 750-52 (10th Cir.1988). The claimant bears the burden of establishing a prima facie case of disability at steps one through four. *See id.* at 751 n. 2. If the claimant successfully meets this burden, the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient**\*614** RFC to perform work in the national economy, given his age, education and work experience. *See id.* at 751. Here the ALJ found that the Commissioner met her burden of proof at step five. We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *See Andrade v. Sec'y of Health & Human Servs.,* 985 F.2d 1045, 1047 (10th Cir.1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fowler v. Bowen,* 876 F.2d 1451, 1453 (10th Cir.1989) (quotations omitted).

**\*\*3** On appeal, Mr. Mullens again asserts that in light of SSR 96-9p, the ALJ finding that Mr. Mullens was not disabled is not supported by substantial evidence in the record.[FN1] We disagree. As discussed by the district court, under SSR 96-9p, even where an individual's exertional capacities, considered alone, would indicate that the individual was not disabled because he could perform a full range of sedentary work, if "the individual also has a nonexertional limitation(s) [such as the inability to stoop] that narrows the potential range of sedentary work to which he or she might be able to adjust" then "the [grids] must be used as a framework for considering the extent of any erosion of the sedentary occupational base." SSR 96-9p, 1996 WL 374185 at \*4.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN1. Mr. Mullens also asserts that the ALJ based his decision directly on the grids, despite the fact that the ALJ claimed to be only using them as a framework, because the ALJ did not make sufficient findings to have based his decision on anything but the grids.  First, it seems clear that the ALJ agreed with the VE's assessment of what jobs Mr. Mullens could perform and based his decision on that testimony and not on a reflexive application of the grids.   Second, to the extent that Mr. Mullens's argument on appeal attempts to directly challenge the form or sufficiency of the ALJ's findings, it presents issues not presented to the district court and such issues will not be considered.   *Berna v. Chater,* 101 F.3d 631, 632-33 (10th Cir.1996) (holding that failure to present issues to the magistrate judge or to include issues in objection to magistrate judge's recommendation may result in waiver).

The ruling states, "[t]here may be a number of occupations from the approximately 200 occupations administratively noticed, and jobs that exist in significant numbers, that an individual may still be able to perform even with a sedentary occupational base that has been erroded."  *Id.* While the ruling states that "a complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled *would usually apply,*" *id.* at *8 (emphasis added), it also directs that "[c]onsultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping."  *Id.* "The vocational resource may be asked to provide any or all of the following:  An analysis of the impact of the RFC upon the full range of sedentary work, ... [and] examples of occupations the individual may be able to perform...." *Id.* at *9. The VE testified that jobs existed in Oklahoma and nationally that Mr. Mullens could perform with his specific limitations, gave examples of those jobs, and testified as to the numbers of the example jobs that existed.    Mr. Mullens presented no evidence disputing the VE's testimony and makes no argument that the jobs presented by the VE do not exist in significant numbers.

In light of the VE's testimony regarding the availability of sedentary jobs that require no stooping, we hold that the Commissioner's factual findings are supported by substantial evidence in the record and **\*615** the correct legal standards were applied.   The decision of the Commissioner is affirmed.

C.A.10 (Okla.),2006.
Mullens v. Barnhart
165 Fed.Appx. 611, 2006 WL 235190 (C.A.10

(Okla.)), 109 Soc.Sec.Rep.Serv. 550

Briefs and Other Related Documents (Back to top)

• 2005 WL 1910518 (Appellate Brief) Brief for Appellee (Apr. 2005)
• 2005 WL 1649556 (Appellate Brief) Plaintiff/Appellant Donal Mullens' Brief (Mar. 28, 2005) Original Image of this Document with Appendix (PDF)
• 04-7132 (Docket) (Dec. 2, 2004)

Briefs and Other Related Documents

This case was not selected for publication in the Federal Reporter.Please use FIND to look at the applicable circuit court rule before citing this opinion. Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)

United States Court of Appeals,Tenth Circuit.

Serrafin Joe HERRERA, Plaintiff-Appellant,

v.

Jo Anne B. BARNHART,[FN*] Commissioner of Social Security, Defendant-Appellee.

FN* On November 9, 2001, Jo Anne B. Barnhart became the Commissioner of Social Security.  In accordance with Rule 43(c)(2) of the Federal Rules of Appellate Procedure, Ms. Barnhart is substituted for Larry G. Massanari as the appellee in this action.

**No. 01-1446.**

July 10, 2003.

Claimant sought review of a decision of the Commissioner of Social Security denying his application for Social Security disability and Supplemental Security Income benefits (SSI). The United States District Court, District of Colorado, affirmed, and the claimant appealed. The Court of Appeals, O'Brien, Circuit Judge, held that: (1) hypothetical question posed to vocation expert was not deficient; and (2) ALJ did not breach the treating physician rule.

Affirmed.

Kane, Senior District Judge, sitting by designation, dissented.

West Headnotes

**[1] Social Security and Public Welfare 356A 146**

356A Social Security and Public Welfare
   356AII Federal Insurance Benefits in General
      356AII(C) Procedure
         356AII(C)3 Judicial Review
            356Ak146 k. Proceedings for Review; Record. Most Cited Cases
District court's approval of Social Security claimant's timely motion to extend time to file a notice of appeal related back to validate his prior notice of appeal, and thus, the notice of appeal was timely.  F.R.A.P.Rules 4(a)(1)(B), (a)(5), 26(a)(3), 28 U.S.C.A.

**[2] Social Security and Public Welfare 356A 142.5**

356A Social Security and Public Welfare
   356AII Federal Insurance Benefits in General
      356AII(C) Procedure

         356AII(C)1 Proceedings in General
            356Ak142.5 k. Hearing and Administrative Review. Most Cited Cases
Hypothetical question posed to vocation expert was not deficient, despite Social Security disability claimant's assertion that the hypothetical should have included a limitation on fine hearing acuity in addition to the background noise restriction, and should have addressed his back and hand pain; hearing impairment leading to inability to tolerate excessive background noise implied a concomitant lack of fine hearing acuity, and ALJ found claimant's testimony about pain not fully credible.

**[3] Social Security and Public Welfare 356A 143.65**

356A Social Security and Public Welfare
   356AII Federal Insurance Benefits in General
      356AII(C) Procedure
         356AII(C)2 Evidence
            356Ak143.30 Disability Claims, Evidence as to

            356Ak143.65 k. Medical Evidence of Disability, Sufficiency. Most Cited Cases
There was no inconsistency between physician's opinions and ALJ's conclusions concerning the claimant's residual functional capacity (RFC), and thus, ALJ did not breach the treating physician rule in a Social Security disability proceeding by failing to give controlling weight to the opinions of the physician.  20 C.F.R. § 404.970(b).

**[4] Social Security and Public Welfare 356A 143.65**

356A Social Security and Public Welfare
   356AII Federal Insurance Benefits in General
      356AII(C) Procedure
         356AII(C)2 Evidence
            356Ak143.30 Disability Claims, Evidence as to

            356Ak143.65 k. Medical Evidence of Disability, Sufficiency. Most Cited Cases
ALJ did not breach the treating physician rule in a Social Security disability proceeding by failing to give controlling weight to the opinion of a physician; the medical source statement and medical re-examination report of the physician were not available at the time of the ALJ's decision, and to the extent he relied on CT scan results that had already been discounted by the ALJ, the Appeals Council could easily have found that his opinion was not sufficiently supported and consistent with other medical evidence to be entitled to controlling weight.  20 C.F.R. § 404.970(b).

Before O'BRIEN and PORFILIO, Circuit Judges, and KANE, [FN**]Senior District Judge.

FN** The Honorable John L. Kane, Senior District Judge, United States District Court

for the District of Colorado, sitting by designation.

## ORDER AND JUDGMENT[FN***]

[FN***] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

O'BRIEN, Circuit Judge.
**1 After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R.App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Plaintiff-appellant Serrafin Joe Herrera appeals from an order of the district court affirming the Commissioner's decision denying his application for Social Security disability and Supplemental Security Income benefits (SSI). Appellant applied for these benefits with protected filing dates, respectively, of February 17, 1995, and April 20, 1995. He alleged disability based on pain in his upper extremities, his shoulder, and his back, cramping of his joints in both arms, and swelling of his hands and fingers. The agency denied his applications initially and on reconsideration.

On September 17, 1996, appellant received a de novo hearing before an administrative law judge (ALJ). The ALJ determined that appellant's residual functional capacity (RFC) was limited by his inability to do work around heights or dangerous machinery and to perform tasks requiring fine hearing acuity or extensive background noise. The ALJ further found that, while appellant has no limitations on his ability to sit, stand, or walk, he should only occasionally bend and stoop, should perform no above-the-shoulder activity, can lift and carry no more than ten pounds frequently and twenty pounds occasionally, and should not use his upper extremities for repetitive grasping, handling, and fingering.

The ALJ determined that appellant could not return to his past relevant work as a sheet metal polisher and buffer. At the time of the ALJ's decision, the claimant was fifty-two years old, had a limited education, and

did not have transferable work skills. The ALJ determined, however, that there were a significant number of other jobs which he could perform in the national or regional economy. Applying the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, Subpt. P, App. 2, rule 202.11 (the grids) as a framework, the ALJ concluded that appellant was not disabled within the meaning of the Social Security Act. The Appeals Council considered additional evidence submitted by appellant and denied review, making the ALJ's decision the Commissioner's final decision.

We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir.1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fowler v. Bowen*, 876 F.2d 1451, 1453 (10th Cir.1989) (quotations omitted).

The Commissioner follows a five-step sequential evaluation process to determine whether a claimant is disabled. **440 *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir.1988). The claimant bears the burden of establishing a prima facie case of disability at steps one through four. *See id.* at 751 & n. 2. If the claimant successfully meets this burden, the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient RFC to perform work in the national economy, given his age, education and work experience. *See id.*

**2 Appellant raises two issues on appeal. He contends that the Commissioner failed to meet her burden at step five of the sequential analysis, because the ALJ's hypothetical question to the VE did not relate with precision all of his impairments. He also argues that the Commissioner violated the treating physician rule or otherwise failed to make a proper assessment of his pain.

[1] At the outset, we are faced with a jurisdictional question involving the timeliness of appellant's notice of appeal. The district court entered final judgment in this case on July 11, 2001. The sixty-day deadline for filing a timely notice of appeal expired on Monday, September 10, 2001. Fed. R.App. P. 4(a)(1)(B), 26(a)(3). Appellant filed his notice of appeal eight days later, on September 18, 2001. Appellant subsequently requested an extension of time to file the notice, by a motion filed within the thirty-day period provided in Fed. R.App. P. 4(a)(5). The district court granted the motion on October 4, 2001. The district court's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

approval of appellant's timely motion to extend related back to validate his prior notice of appeal. *Hinton v. City of Elwood, Kan.,* 997 F.2d 774, 778 (10th Cir.1993). We conclude that the notice of appeal was timely and that we have jurisdiction.

[2] Before the district court, appellant argued that the VE hypothetical was deficient because it did not include any limitations regarding hearing limitations or pain. Aplt.App., Vol. II at 393-95; *see also id.* at 415-17. In his brief in this court, he seeks to expand his argument to include omitted limitations on walking over uneven surfaces; on stooping, squatting, twisting or climbing; on the need to sit and stand alternatively because of back pain; on the ability to cope with occurrence of dizziness, black-outs and blurred vision; on cold intolerance; and on grip strength. Aplt. Opening Br. at 19-21. We will confine ourselves to those issues presented to and ruled upon by the district court. *Crow v. Shalala,* 40 F.3d 323, 324 (10th Cir.1994).

A hypothetical question to the VE "must reflect with precision all of [the claimant's] impairments, but [it] need only reflect impairments and limitations that are borne out by the evidentiary record." *Decker v. Chater,* 86 F.3d 953, 955 (10th Cir.1996). The ALJ's hypothetical question did include a hearing limitation. The ALJ asked the VE to assume that appellant should avoid "environments with excessive background noise." Aplt.App., Vol. I at 72. Appellant complains that this limitation is inconsistent with the ALJ's RFC finding that he cannot perform tasks requiring "fine hearing acuity or extensive background noise." *Id.* at 21. Basically, he complains that the VE hypothetical should have included a limitation on fine hearing acuity in addition to the background noise restriction.

We reject this argument. A hearing impairment leading to inability to tolerate excessive background noise implies a concomitant lack of fine hearing acuity. Appellant's attempt to draw a distinction between the two conditions is unsupported by any cogent argument. As the district court noted, the VE was present for the hearing, at which appellant's hearing restrictions were discussed in some detail. *Id.* at 68. This being the case, the effect of a slight and technical omission or ambiguity**441 in the hypothetical question, if any, was minimal. *See Diaz v. Sec'y of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir.1990).

**3 Appellant also complains that the ALJ did not mention his back and hand pain in the VE hypothetical. In his decision, the ALJ assessed the effect of appellant's pain on his RFC. He found appellant's testimony about pain not fully credible, and determined that appellant has "no limitations on his ability to sit, stand, or walk." Aplt.App., Vol. I at 21. The ALJ's hypothetical question reflected this lack of limitation, and was consistent with his RFC determination. The ALJ also incorporated into both his RFC determination and his VE hypothetical limitations on appellant's ability to perform above the shoulder activity, and to use his upper extremities to perform repetitive grasping, handling, and fingering. We conclude that the VE hypothetical adequately reflected the ALJ's conclusions concerning the effect of pain on appellant's ability to work. The ALJ was required to include only those impairments borne out by the evidentiary record. *Decker,* 86 F.3d at 955.

[3] Appellant next argues that the ALJ breached the "treating physician rule" by failing to give controlling weight to the opinions of Dr. Parks and Dr. Seidl. Dr. Parks described the impairment of appellant's upper extremities, opining that it was "not likely [appellant] could return to physical labor in a competitive environment" and that he could no longer work as a sheet metal worker. Aplt.App., Vol. I at 246. He noted that appellant "has increased pain with increased effort along with chronic flexor tendon inflammation, aggravated with sustained gripping, grasping, twisting, turning, lifting, and carrying." *Id.* We perceive no inconsistency between Dr. Parks' opinions and the ALJ's conclusions concerning appellant's RFC. Like Dr. Parks, the ALJ concluded that appellant could not return to his past work as a sheet metal worker or perform other forms of "physical labor" more strenuous than light and sedentary work. The ALJ also concluded that appellant was restricted from performing repetitive grasping, handling, or fingering, a conclusion not inconsistent with Dr. Parks' opinion that sustained performance of such activities caused appellant pain.

[4] Dr. Seidl opined in a medical source statement that appellant could only sit, stand, and walk for two hours each in an eight-hour work day, and could not work at a competitive pace for eight hours a day, five days a week. *Id.* at 383. He described appellant's pain as "frequently debilitating" and stated appellant could use a screwdriver, but not a wrench. *Id.* at 385. In a medical re-examination report submitted to the Colorado Department of Human Services, Dr. Seidl diagnosed appellant with major depression in addition to his other ailments, and certified that appellant would be unable to work at any job for a period of twelve or more months due to a disabling physical or mental impairment. *Id.* at 382.

Dr. Seidl's medical source statement and medical re-examination report were not available at the time of the ALJ's decision. They were submitted to the Appeals Council, and thereby became part of the record for our review. *O'Dell v. Shalala,* 44 F.3d 855, 859 (10th Cir.1994). There is a limit to our use of this after-acquired medical evidence, however. The

new evidence is only relevant to the extent it relates to the time period on or before the date of the ALJ's decision, November 25, 1996. 20 C.F.R. § § 404.970(b); 416.1470(b).

**\*442 \*\*4** The record does not show that Dr. Seidl saw appellant or became his treating physician prior to December 1996. Dr. Seidl's medical source statement and re-examination report purport to detail appellant's work limitations as they existed in the fall of 1997, nearly a year after the ALJ's decision. In reaching his conclusion in the medical source statement that appellant was disabled, Dr. Seidl relied on "new studies," Aplt.App., Vol. I at 383, apparently including nerve conduction studies performed on June 3, 1997. *Id.* at 376.

Appellant argues, however, that in reaching his opinion, Dr. Seidl also relied on a 1997 MRI test that showed "stable" findings from a prior August 6, 1996, CT scan. *Id.* at 340. While this factor ties Dr. Seidl's opinion back to evidence received during the relevant period, the "stable" finding is problematic for appellant. The ALJ had the August 6, 1996, CT scan results in front of him when he made his decision, and he discounted them in light of the other evidence concerning the severity of the alleged back impairment. New evidence does not require a change in the ALJ's decision if that decision remains supported by substantial evidence. *O'Dell*, 44 F.3d at 859. To the extent Dr. Seidl relied on CT scan results that had already been discounted by the ALJ, the Appeals Council could easily have found that Dr. Seidl's opinion was not sufficiently supported and consistent with other medical evidence to be entitled to controlling weight. *See* 20 C.F.R. § § 404.1527(d)(2) (treating physician rule); 416.927(d)(2) (same).

Finally, appellant includes several free-standing arguments about the ALJ's evaluation of his pain. These arguments were not presented in his district court briefs. We therefore decline to consider them.

The judgment of the United States District Court for the District of Colorado is AFFIRMED.

Judge KANE dissents.
C.A.10 (Colo.),2003.
Herrera v. Barnhart
69 Fed.Appx. 438, 2003 WL 21545935 (C.A.10 (Colo.))

Briefs and Other Related Documents (Back to top)

• 01-1446 (Docket) (Sep. 21, 2001)

END OF DOCUMENT

Only the Westlaw citation is currently available.
United States District Court, D. Kansas.
Augie Jaye HARKINS, Plaintiff,
v.
Louis W. SULLIVAN, M.D., Secretary of Health
and Human Services, Defendant.
**No. 85-1511-C.**

Nov. 6, 1990.

David H.M. Gray, Gragert, Hiebert & Gray, Wichita, Kan., for plaintiff.
Stephen K. Lester, Assistant U.S. Attorney, Wichita, Kan., for defendant.

MEMORANDUM AND ORDER

CROW, District Judge.
**\*1** The case comes before the court on plaintiff's motion for attorney fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412. By its order filed January 3, 1989, the court reversed the Secretary's denial of disability benefits and supplemental security income and remanded the case for further proceedings consistent with the order. On remand, the ALJ found the claimant disabled as of March 9, 1984, a later date than that alleged as the onset date in the second application for benefits. The Appeals Council then modified the ALJ's decision finding the claimant was disabled on the alleged onset date.

Plaintiff now seeks attorney's fees in the amount of $4,625.51 ($98.52 hourly rate times 46.95 hours) and an order that $330.04 should be retained by plaintiff's attorney for his work on the EAJA application and that the smaller of $4,502.36 or the amount of the Title II attorney's fees should be refunded to the plaintiff. The Secretary insists his position was substantially justified and also points out that plaintiff has not made an application for a Title II contingency fee and has cited some inapplicable statute.

Under EAJA, "a court shall award to a prevailing party other than the United States fees and other expenses, ... unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). The "position of the United States" is defined by statute to include those actions taken at the agency level upon which the civil action is based as well as the position assumed during the civil action. 28 U.S.C. § 2412(d)(2)(D). Social security disability review cases are covered under EAJA. Martinez v. Secretary of Health & Human Services, 815 F.2d 1381, 1382 (10th Cir.1987). Having secured benefits upon judicial review under the Social Security Act, the plaintiff is a prevailing party within the meaning of the

EAJA. See McGill v. Secretary of Health & Human Services, 712 F.2d 28, 31-32 (2d Cir.1983), cert. denied, 465 U.S. 1068 (1984).

The Secretary has the burden of showing his position was substantially justified. Weakley v. Bowen, 803 F.2d 575, 577 (10th Cir.1986). Wary of substituting a new standard for that expressed by statute, the Supreme Court explained "substantially justified" as not "justified to a high degree," but rather " 'justified in substance or in the main'-that is, justified to a degree that could satisfy a reasonable person." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Stated another way, the Secretary must show its position had a "reasonable basis in law and fact." Id. The reasonableness test has three criteria: (1) a reasonable basis for factual allegations; (2) a reasonable legal theory; and (3) a reasonable factual support for the legal theory advanced. Gatson v. Bowen, 854 F.2d 379, 380 (10th Cir.1988).

To be substantially justified, a position must be stronger than that which may be sanctionable as frivolous. Pierce, 487 U.S. at 566. Even if incorrect, a position may be substantially justified if a reasonable person could believe it correct. Id. at 566 n. 2. The Tenth Circuit has adopted the majority rule that the lack of substantial evidence on the merits does not automatically equate with no substantial justification. Hadden v. Bowen, 851 F.2d 1266, 1269 (10th Cir.1988). On the other hand, lack of "substantial evidence" is indicative that a position was not "substantially justified." Id. The determination of whether the Secretary's position is substantially justified is made from the basis of the entire record including that with respect to the agency's actions or lack thereof. 28 U.S.C. § 2412(d)(1)(B).

**\*2** The Secretary first argues that the ALJ's decision had a reasonable basis because the plaintiff was awarded benefits on remand only after additional evidence was heard. This court found no substantial evidence on appeal "that plaintiff could or could not walk or stand a good deal of the time or sit with some pushing and pulling of leg controls," as contemplated in the performance of light work. The ALJ, without any explanation, ignored the existence of the alleged impairment prior to the date of his decision in determining whether the durational requirement was met. In addition, the grids were conclusively applied despite some evidence that plaintiff suffered from pain, a nonexertional limitation. Finally, the ALJ discounted the plaintiff's complaints of pain as "the evidence [in apparent reference to the medical evidence] fails to establish that it is of such severity and duration as to interfere with his ability to perform basic work-related activities." The record, however, was devoid of any evidence showing that the pain would not impede plaintiff's performance of light

work.   The fact the ALJ refused to develop an adequate record and chose to decide the claim on evidence utterly lacking substantial weight establishes a lack of reasonable basis in law and fact.

The Secretary's other argument in opposition to attorney's fees is:

Some of the court's concerns with the ALJ's decision, such as ignoring subjective elements of pain, and the use of the grids on a claimant with nonexertional limitations, were based on case law holdings in 1986 and 1988, after the decision was originally rendered by the ALJ.   While not improperly applied to the reconsideration of plaintiff's case on remand, such cases should not be a basis for finding that the ALJ misapplied the law and that his decision was not, as a result, substantially justified.

This argument begs the question whether this court applied any law not controlling as of the time of the ALJ's decision.   Though he calls attention to the cases cited by the court as being handed down after the ALJ's decision, the Secretary carefully eschews taking the position that any of the rules of law cited in those cases did not exist or govern the ALJ's decision.   This court has no basis to presume that any of the decisions relied upon by this court in its decision actually created the legal principles for which they were cited.   What constitutes substantial evidence, what is the durational requirement, what is the ALJ's duty to develop the record and when does a nonexertional limitation preclude the conclusive application of the grids were issues firmly resolved as of the ALJ's decision.   The Secretary's argument is entirely lacking in substance.

Plaintiff requests the upward adjustment of the $75 cap on hourly rates under EAJA to reflect the impact of the increased cost of living, a factor specified at 28 U.S.C. § 2412(d)(2)(A)(ii).   Evidence of a cost of living increase does not mandate a proportionate increase in the hourly rate;  these matters are firmly vested in the district court's discretion.   *Headlee v. Bowen,* 869 F.2d 548, 551-52 (10th Cir.), *cert. denied,* 110 S.Ct. 507 (1989).   The Secretary does not object to the plaintiff's suggested adjustment.   In the exercise of its discretion, the court believes under the circumstances of the present case the increase in the cost of living justifies a higher hourly rate as measured from the date of the enactment of EAJA in 1981.   It is appropriate to calculate the cost of living increase based upon the rise in the consumer price index for the Kansas City area.   *Reyes v. Bowen,* No. 83-1559-C (D.Kan. Oct. 26, 1989); *Stang v. Sullivan,* No. 88-1429-C (D.Kan. May 8, 1990).   Plaintiff offers an hourly rate of $98.52 after adjusting for the cost of living factor.   The court finds

it appropriate to award the plaintiff attorney's fees in the amount of $4,625.51 ($98.52 hourly rate times 46.95 hours).

**\*3** The court does not share plaintiff's interpretation of the savings provision to 24 U.S.C. § 2412 found at Section 206 of Pub.L. 96-481, as amended by Pub.L. 99-80, § 3, Aug. 5, 1987, 99 Stat. 186.   The key sentence simply prevents the criminal penalty provision of 42 U.S.C. § 406(b)(2) from applying when the claimant's attorney refunds to the claimant the smaller of the Title II award or the EAJA award recovered for the same work.   Furthermore, the EAJA application is work for the claimant in the sense that a recovery would offset any reduction from the claimant's benefits for Title II contingency fees.   The court denies the request that plaintiff's attorney separately retain those fees incurred for the work on the EAJA application.

IT IS THEREFORE ORDERED that plaintiff's motion for attorney's fees under EAJA is granted, and an award of $4,625.51 is made to plaintiff's counsel.   The smaller of this sum or the amount of the Title II attorney's fee should be refunded to the plaintiff.

D.Kan.,1990.
Harkins v. Sullivan
Not Reported in F.Supp., 1990 WL 193778 (D.Kan.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.